IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ROSS R. THILL,

                              Petitioner,                    OPINION and ORDER

        v.
                                                             18-cv-1005-jdp
REED RICHARDSON,

                              Respondent.

Petitioner Ross R. Thill was convicted, after a jury trial, on one count of sexual assault of a child. Thill, by postconviction counsel, now seeks a writ of habeas corpus under 28 U.S.C. § 2254. The case is fully briefed and ready for decision.

Thill's defense at trial was that the child's mother, his ex-girlfriend, framed him by planting his semen on the child's underwear and coaching her to make false abuse accusations. In his petition, Thill contends that his trial counsel was constitutionally ineffective by failing to object on two occasions when the prosecutor noted that Thill did not present this theory when he was first questioned by law enforcement.

Thill is correct that the prosecutor violated *Doyle v. Ohio*, 426 U.S. 610 (1976), which holds that silence following *Miranda* warnings may not be used to impeach a defendant's testimony at trial. But in the context of a petition for a writ of habeas corpus for ineffective assistance, Thill must do more than show that there was a trial error. He must also show that the state court acted contrary to or unreasonably applied the federal standard for ineffective assistance. In this case, the Wisconsin Court of Appeals concluded that Thill hadn't met that standard because he couldn't show prejudice. Specifically, the court said that the prosecutor's comments were only a smart part of the trial that included a substantial amount of other

evidence, so there wasn't a reasonable probability that the outcome of the trial would have been different even if counsel had objected.

The prosecutor's comments were a clear violation of the Constitution. And if this were a de novo review, I might well agree with Thill that his trial counsel failed to provide effective assistance. But "federal habeas relief from state convictions is reserved for those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision–making about federal constitutional claims." *Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 443 (7th Cir. 2020) (internal quotation marks omitted). The court of appeals' decision was terse, but the court applied the correct standard and provided plausible reasons for concluding that Thill hadn't been prejudiced. Even if I disagree with that reasoning, I cannot say that the court's decision is an unreasonable application of federal constitutional law. So I will deny Thill's petition.

BACKGROUND

The following facts are taken from the petition and the state court records provided by Thill and the state.

**A. Trial and sentencing**

In 2013, Thill was charged in state court with one count of repeated sexual assault of the same child, in violation of Wis. Stat. § 948.025(1)(b). The child in question was AMM, the 8-year-old daughter of Thill's ex-girlfriend, April Gray. Gray and Thill had broken up in 2011, but AMM had occasional overnights at Thill's house even after the breakup because AMM was friends with Thill's two daughters. The sexual assaults were alleged to have taken place during these visits. The last of these overnights occurred the night of Friday, March 8,

2013. AMM later said that Thill sexually assaulted her in his car on the way to his house that evening.

AMM told both Gray and Barbara Martin, Gray's mother and AMM's custodial parent, about the assault. Martin took AMM to the hospital for a sexual assault nurse examiner (SANE) examination on March 10. The exam revealed no evidence of physical trauma, but a sample taken from the crotch area of AMM's underwear tested positive for Thill's semen. AMM had a forensic interview with a social worker on March 18, during which she said that Thill had assaulted her multiple times.

Thill was arrested and charged soon thereafter. He pleaded not guilty to the charge and the case proceeded to a four-day jury trial in June 2014. Thill was represented by Attorney Chris Doerfler. At trial, both sides called ten witnesses. For purposes of this habeas petition, the most relevant testimony came from AMM, Gray, and Thill, who testified in his own defense.

### 1.  AMM's forensic interview and trial testimony

In lieu of conducting a direct examination of AMM, the state played a video of her March 18 forensic interview for the jury. At the start of the interview, AMM presented a journal to the social worker in which she had written "[s]tuff that Ross did" and "[s]tuff that Ross said." Dkt. 6-11, at 159. She read it aloud to the social worker:

> A. Ross put his finger in my crotch in his van and his peter. He kissed me in the crotch. He wiggled his finger. It was at Ross's house at night. I was very disappointed. I like his children. I felt sad. I would get in trouble if I told. But I was by a white house at night. He pushed on my tummy and made it hurt. I was by a very dark road and a yellow sign, and he said my skin was so soft.
>
> . . .

3

> A. He put my cloth[e]s in a bag, he called mom, and I wanted to go home and have lasagna for dinner. His children were very mean. They didn't let me play hide and seek. [Thill's daughter] said there are only three players and I took a shower at Ross's house and I had - - I forgot that word.
>
> Q. [The social worker, reading from the diary] Had to wear one of Ross's shirts.
>
> A. Shirts. And he took my pants off.
>
> Q. Okay.
>
> A. We had sausages and eggs for breakfast. I was too tired to eat because he woke me up last night, a long time ago.

Dkt. 6-11, at 175–76.

The forensic interview continued, and AMM provided more details. She stated that Thill had put his penis (which she called a peter) inside her vagina (which she called a crotch) and her "cheeks" (presumably a reference to her buttocks). *Id.* at 178–79. But she was unclear about when and where these things happened. She said that assaults occurred in Thill's van and at his house (on a couch, on the living room floor, on the bed in Thill's bedroom, and in Thill's daughters' bedroom). *Id.* at 177, 181, 186, 190–97. She was vague about when and how often the assaults occurred. When the social worker asked AMM when Thill would tell her that her skin was soft, she said, "He told me that last night. He repeated it like 30 times." *Id.* at 184.

After the forensic interview was played to the jury, Thill's trial counsel cross-examined AMM from a different room via closed-circuit television. She said that at some point "pretty recently," Thill had dropped her off in a "weird forest," where she met a band of deer hunters. *Id.* at 215–16. One of the hunters, Santonio, was good friends with Thill and knew where he lived; AMM wanted to go back to Thill's house, so Santonio took her there. *Id.* at 216.  AMM

hadn't seen Thill in over a year by the time of trial, and Martin, Thill, and other witnesses testified that they didn't know anyone named Santonio.

Other aspects of AMM's trial testimony were inconsistent with the information she'd provided in her forensic interview. For instance, during the forensic interview, AMM said that Thill took her pants and shirt off in the van, *id.* at 179, and that he climbed over to the front passenger seat where she was sitting and reclined it "way, way back" when he assaulted her. *Id.* at 186–87. During cross-examination, she stated that the assault had happened in the back seat, not the front. *Id.* at 241, 243. Her clothes stayed on except that her pants were "pulled down a little bit"; her underwear stayed up and Thill's penis didn't go inside, he just "set it right on top" of her underwear. *Id.* at 241, 243, 246–49. AMM further testified that she had never seen anything come out of Thill's penis. *Id.* at 230–31, 261.

Both the state and the defense offered witness testimony about the challenges associated with interviewing young children and making sense of their testimony. *See id.* at 94–151 (testimony of Julie Anderson for the state) and Dkt. 6-12, at 221–305 (testimony of Dr. David Thompson for the defense). The defense's expert identified several aspects of AMM's forensic interview that, in his view, raised concerns that AMM may have been influenced by others. For instance, he said that he found it odd that AMM immediately presented her journal to the interviewer, and then had trouble reading and pronouncing some of the things she had written.

### 2. Gray's testimony

Gray testified that she and Thill had dated for a few months, during which it became clear that Gray cared a lot more for Thill than Thill cared for her. Dkt. 6-10, at 174. This dynamic eventually led Thill to break off things with Gray. Despite the breakup, Gray testified

that she and Thill remained on good terms, even after Thill began a relationship with someone else. Gray testified that she didn't drive by Thill's house, call his work during his shifts, show up at places he frequented, or attempt to get back together after their relationship ended. She also denied saving Thill's semen and testified that they hadn't used condoms during their relationship. *Id.* at 175.

Because AMM had become friends with Thill's two daughters, Gray allowed AMM to go to Thill's house for overnight visits almost "every other weekend" to spend time with them, up to and including March 8, 2013. *Id.* at 122, 123.

On the morning of March 8, Gray and AMM were alone at Martin's house in Rockland, Wisconsin. AMM was brushing her teeth when she told Gray that Thill "touched her in her private parts." *Id.* at 124. Gray asked her what she meant, and AMM "pointed to her vagina area." *Id.* Gray "told her that that's not something you want to make up. That's not something you want to lie about. Ross could get in a lot of trouble about that. If that actually happened, you're not going back anymore." *Id.* AMM started crying, and Gray said "why are you crying if this actually happened?" *Id.* AMM told Gray that she wanted to go spend time with Thill's daughters, so Gray concluded that AMM must have been lying about Thill touching her. *Id.* at 124–25. She later explained that she was initially reluctant to believe AMM because AMM "lies a lot." *Id.* at 153.

Later that day, after AMM got home from school, Thill came to Rockland to pick AMM up for the overnight, around 5:00 p.m. When AMM saw that Thill didn't have his girls with him in the car, she seemed "really distressed, under stress, upset." *Id.* at 126. Gray let AMM go with Thill anyway. A few hours after they left, Gray got a call from Thill that AMM was "crying, saying that she wanted to come home because she missed grandma." *Id.* at 127. Thill

6

told Gray that they were still on the road, near Four Corners, Wisconsin. Gray didn't have enough gas to pick up AMM, so Thill agreed to bring her back to Rockland. A short while later, AMM called Gray back, "still sort of upset, but she said that she was just going to go to Ross's so that she could spend time with [Thill's children]." *Id.* at 128 (cleaned up).

When Thill dropped AMM off with Gray the following morning, AMM went straight to her bedroom without hugging Thill goodbye, which was unusual for her. After Thill left, Gray went to AMM's room and asked her what was wrong. AMM wouldn't say. Gray called Martin to let her know her suspicions. Later that evening, Gray and Martin spoke to AMM together, and AMM made another disclosure of the abuse. Martin took AMM to the hospital for the SANE exam the next day.

Gray testified that she had no motive to set Thill up, that she didn't plant any evidence, and that no one coached AMM on what to say to investigators.

### 3.  Thill's testimony

Thill testified that he and Gray started a casual relationship in the spring of 2011. He and Gray had incompatible goals for the relationship. Gray wanted to get serious and told others that she and Thill were going to get married and move in together. Thill made clear to Gray that he "had no interest in that type of relationship." Dkt. 6-12, at 485. At one point, Thill started using condoms with Gray because he had heard that she was sleeping with other men. Toward the end of the relationship, on occasions when they didn't use condoms, "rather than having the finish inside, [Gray] had these little containers by the bed that she'd finish [him] in" that resembled the "little disposable container you buy to put . . . condiments in." *Id.* at 493.

7

Thill's attorney asked Thill whether Gray explained why she did this. Thill said she had, and that he found her explanation "a little weird." *Id.* at 494. Counsel instructed Thill that he couldn't "say what she said," because "it's hearsay." *Id.* But based on defense counsel's line of questioning when examining Gray adversely, it appears likely that Thill would have testified that Gray said she was saving his sperm so she could "get [her] tubes untied and have his baby." Dkt. 6-12, at 590. (Gray denied having said or done any of this.)

According to Thill, Gray's strange behavior didn't stop even after she and Thill broke up for good. Gray would repeatedly call the pizza restaurant where Thill worked to ask whether he was there. She would show up at the restaurant and park in the parking lot, within view of Thill's car. She would show up at a bar Thill frequented. She would park outside Thill's house, even after he told her to stop. Gray made "threats" toward Thill, but Thill didn't specify what the threats were about. *Id.* at 501. In the meantime, Thill began dating someone new. That relationship quickly became serious. Before long, Thill and his new partner had moved in together.

Thill testified that after his breakup with Gray, AMM came to his house for overnights on only three occasions, with the final overnight occurring on March 8, 2013. *Id.* at 507–08. On that evening, Thill arrived in Rockland to pick up AMM around 5:45. Gray tried to hug and kiss Thill, but he brushed her off by making it seem like he was in a rush and needed to run errands. With AMM in tow, Thill drove from Rockland to Bangor, where he got gas, and then north towards Melrose. During the car ride, AMM started asking inappropriate questions that Thill suspected Gray had encouraged her to ask.[1] Thill deflected AMM's questions and

---

[1] Thill was again unable to explain what those inappropriate questions were because the state objected on hearsay grounds and the judge sustained the objection. *See id.* at 522. This ruling

told her that she could either talk about something else or stay quiet for the rest of the ride. A short while later, Thill noticed that AMM was crying about missing her grandma. Thill pulled over and called Gray. They decided that Thill would take AMM back to Rockland. AMM changed her mind a short while later, so they called Gray back and told her that AMM was going to stay over at Thill's after all. Thill and AMM continued on to Melrose, where Thill picked up cigarettes and ice cream before arriving home around 7:00 p.m.

The next morning, Thill drove AMM back to Rockland. The overnight hadn't gone particularly well. The kids had squabbled, and Thill believed that his girls and AMM seemed to be growing apart. There was also the matter of the inappropriate questions AMM had asked Thill in the car. So when Thill dropped AMM off with Gray, he told Gray that there would be no more overnights, and that Gray needed to stop calling and texting him. Gray reacted angrily. She followed Thill as he walked back to his car, yelling and making threats. About a week and a half later, the police contacted Thill about AMM's allegations.

### 4. Other evidence

Thill's theory of defense at trial was that Gray had planted his semen in AMM's underwear and coached her to make false allegations because she was upset and jealous that Thill had entered into a serious relationship with another woman. In support of this theory, the defense offered testimony from Thill's former boss at the pizza restaurant, Suzanne Lauscher. Lauscher testified that in December 2011 and January 2012, the restaurant would often get several calls a night, always from the same number, from a woman who would either

---

is not part of Thill's habeas petition, so I won't consider it.

hang up immediately or ask if Thill was working that evening. When Lauscher asked Thill about the calls, Thill told her it was his "crazy ex." *Id.* at 468.

The defense also introduced evidence that Gray had been caught lying to police in 2009, when she was being investigated for sending pictures of herself to a minor. She told the police that the minor must have gotten her phone and sent the pictures to himself, but she later admitted that the story was a lie. *Id.* at 591. Thill's counsel also questioned Gray about an occasion in 2008 when she reported her husband for violating his probation because she was angry at him and wanted to get him arrested; she later called the police back and told them that she had lied. *Id.* at 591–92. Gray said that she had no recollection of having done this.

Martin testified about her initial questioning of AMM and her decision to take AMM to the hospital for a SANE exam. She said that she noticed certain changes in AMM following the March 8 overnight; AMM had nightmares, and she engaged in other uncharacteristic behaviors, such as cutting up paper with scissors and humping her bed.

Jennifer Vogt, a forensic scientist from the Department of Justice's state crime lab, testified that AMM's underwear tested positive for Thill's semen, but that the introitus secretion swabs and exterior genital wipes did not. Natalie Ready and Dr. Lee Johnson, the medical providers who conducted AMM's SANE exam, testified that the absence of evidence of physical trauma ruled out the possibility that AMM had recently been subjected to a forceful penetration by an erect adult male penis, but not the possibility that AMM had been assaulted in other ways. Dkt. 6-10, at 207–08 and Dkt. 6-11, at 350. Both stated that AMM had said during the exam that Thill had touched her vaginal area. Dkt. 6-10, at 203 and Dkt. 6-11, at 348–49.

Melissa Marchant, a criminal analyst with the Wisconsin Division of Criminal investigation, testified about where the cell tower data placed Thill during the night of March 8. But that data didn't contradict Thill's account of driving from Rockland to Melrose, stopping to run various errands along the way. And Kelly Bakken, a detective with the Jackson County Sheriff's Department who executed search warrants on Thill's property, testified that searching seats in Thill's car and mattresses and other items from his home with an alternative light source had revealed no evidence of semen.

### 5.  Comments on Thill's silence

Thill testified on the last day of trial. After defense counsel finished his direct examination, the prosecutor, Gerald R. Fox, began his cross-examination with the following colloquy about Thill's failure to volunteer his defense to law enforcement:

> Q. Now, Mr. Thill, you've been present throughout the trial and you've been able to hear all the evidence that's been presented to the jury so far, correct?
>
> A. Yes.
>
> Q. Isn't it true that the first time you've told this account is today?
>
> A. No. I've had discussions with [my attorney] before.
>
> Q. Aagh. But when you had the opportunity to tell law enforcement these facts that you hoped would exonerate you, you did not do that?
>
> A. No, I did not.

Dkt. 6-12, at 556. Then, near the end of his closing argument, Fox revisited the issue of Thill's silence:

> How could [Gray] have set this up? A little cup, oh, she finished me off in a little container. What? She's had her tubes tied, she's not using a condom, why does this woman that I don't really care

about want to keep my sperm? That is something so alarming, so discomforting.

That would be – you want to talk about a red flag, there's a red flag, what do you mean, absolutely not, and Detective Bakken there heard it for the first time today.

Now, folks that are under investigation are absolutely entitled to remain silent. I must have said that to 150 clients when I was a defense attorney, you shut your mouth, I'll tell you when you can speak, and God help the ones who didn't listen to me. But if what he told you is true, wouldn't we want to know that over a year ago and not put ourselves through this process?

As a result of this case, apparently the mother of [Thill's two daughters] has gotten an order or some other thing that he can't see those two daughters. Wouldn't you have an interest in getting your exoneration out there, but instead we hear it for the first time from the witness stand.

Now, there are a lot of very good reasons why that might be, but it is something that you are allowed to consider in deciding what weight to give the defendant's testimony, what weight, and that's what this is really all about.

*Id.* at 682–83. Thill's attorney did not object to this aspect of the state's cross-examination or closing argument.

### 6. Conviction and sentencing

At the close of evidence, the state requested that the charge be amended from repeated sexual assault of a child in violation of Wis. Stat. § 948.02(1)(b) (which criminalizes "sexual intercourse with a person who has not obtained the age of 12 years"), to repeated sexual contact with a child in violation of Wis. Stat. § 948.02(1)(e), which prohibits "sexual contact or sexual intercourse with a person who has not obtained the age of 13 years."[2] *See* Dkt. 6-12, at 608–

---

[2] Wisconsin law defines "sexual intercourse" as "vulvar penetration as well as cunnilingus, fellatio or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genitalia or anal opening either by the defendant or upon the defendant's instruction." Wis. Stat. § 948.01(6). "Sexual contact" is defined more

14. The state also requested that the jury be instructed on the lesser included offense of a single count of sexual contact occurring on March 8, 2013. *Id.* at 608, 615. The court granted both requests.

After deliberating for an hour, the jury acquitted Thill of repeated sexual contact of AMM but found him guilty of the lesser included offense of one count of sexual contact occurring on March 8, 2013. *Id.* at 734. The judge imposed a 25-year sentence consisting of 16 years of initial confinement and 9 years of extended supervision.

## B. Postconviction motion and evidentiary hearing

Thill, through new counsel, filed a postconviction motion requesting a new trial on the ground that his trial counsel had been constitutionally ineffective in various ways. The only ineffective-assistance claim at issue in this petition is his claim that trial counsel was ineffective by failing to object and move for a mistrial based on the prosecutor's comments during cross-examination and closing arguments about Thill's silence under questioning by law enforcement.

The circuit court held an evidentiary hearing at which Thill's trial counsel testified. He confirmed that he was most likely aware at the time of trial that Thill had been informed of his *Miranda* rights, made some initial statements to investigators, and then invoked his right to a lawyer.[3] Dkt. 6-15, at 18–19. He didn't specifically recall whether he thought about objecting when the prosecutor asked, "But when you had the opportunity to tell law

---

broadly to include things like "intentional touching" of "the intimate parts of another person," whether direct or through clothing, if that intentional touching is either for the purpose of sexually degrading or sexually humiliating the complainant or sexually arousing or gratifying the defendant." *Id.* § 948.01(5)(a)(1).

[3] The transcript of Thill's interrogation and invocation was entered into evidence at the hearing but it has not been provided to this court.

13

enforcement these facts that you hoped would exonerate you, you did not do that?" *Id.* at 20.

He said that he considered the comment to be:

> pretty close to the line. Not over the line. And sometimes when
> you object and make a big deal out of a prosecutor pushing the
> envelope on things like that, you just draw the jury's attention to
> the point that the prosecutor is trying to make. And Mr. Fox is a
> very good prosecutor, and I suspect he was hoping I would do so.
> So I don't know. I don't recall the question in realtime, but that
> would have been a consideration that would have been in my
> head.

*Id.* When asked whether he thought the question was proper in hindsight, trial counsel wasn't

sure. He noted that the prosecutor "d[idn't] specifically say anything about invoking. And I

don't know sitting here without doing research whether that's where the line gets crossed or

not. I know he was getting close to the territory. That is a gray area for sure." *Id.* at 21. He gave

a similar answer when asked to explain why he failed to object to the prosecutor's silence-

related comments during his closing argument. He said he thought that the commentary was

"pushing the envelope. And I think it's potentially improper. I've seen worse." *Id.* at 21–22.

The circuit court made an oral ruling denying Thill's postconviction motion. She found

that Thill "clearly started talking and gave the investigating officer information after he waived

his Miranda rights. He later did invoke them, but he did start talking." *Id.* at 54.[4] She concluded

that the state had "every right to question him" about his initial statements to law enforcement,

and that the prosecutor's commentary was not "a breach of that." *Id.* at 54, 55. Noting that

---

[4] Because the transcript of Thill's interrogation isn't in the record, it's not clear exactly what comments Thill made prior to invoking his right to counsel. According to a summary given by the prosecutor during the post-conviction hearing, the detective told Thill that she was investigating a report that Thill had "touched a juvenile female by the name of [AMM]." *Id.* at 24. Thill went onto make "certain material statements" to the detective about "what he was doing, where he was," and that he "had some contact with A.M.M." *Id.* at 23, 24.

both attorneys had said that there's "a fine line" between what's permissible and what's not, the court found that Thill's counsel "made a conscious decision not to object. He's the trial counsel who has to make the decisions upon tactical reasons . . . He made . . . the decision not to object indicating that he could have made a conscious decision not to object because it could in fact draw more attention to it." *Id.* at 55.

## C. Wisconsin Court of Appeals decision

The Wisconsin Court of Appeals affirmed the circuit court's denial of Thill's postconviction motion. *See* Dkt. 6-5. The court found that the state had conceded the impropriety of the prosecutor's questions and comments by failing to engage with Thill's arguments, and it therefore assumed that trial counsel's failure to object constituted deficient performance. *Id.* ¶¶ 22, 23. But the court concluded that Thill's motion still failed because he hadn't demonstrated prejudice, noting:

> The prosecutor's questions and comments were isolated, made at the start of a lengthy and wide-ranging cross-examination of Thill and in the midst of a lengthy closing argument, at a trial that lasted three days, during which the parties called nineteen witnesses and presented forty-five exhibits. The State's evidence included AMM's forensic interview statements, her statements during her physical examination, her trial testimony, and testimony by her mother and grandmother. Thill presented evidence challenging AMM's credibility, supporting his defense that AMM's mother was motivated to frame him after he ended their relationship, and showing his good character. The jury acquitted Thill of repeated acts of sexual assault and found him guilty of one act of sexual contact committed on the date of the incident described earlier in this opinion. In reaching that verdict, the jury would have been focused on the credibility of AMM, her mother, and her grandmother; on the physical evidence related to the other incidents charged; and also on Thill's credibility as to all the incidents charged. Thill fails to show that there is a reasonable probability that, but for his trial counsel's failure to object to the prosecutor's brief and isolated questions about Thill's failure to tell the detective his full account of one of the incidents, the verdict would have been different.

> This case is not like *Odell v. State*, 90 Wis. 2d 149, 151–54, 279
> N.W.2d 706 (1979), *on reconsideration of Odell v. State*, 87 Wis. 2d
> 294, 274 N.W.2d 670 (1979), which involved one incident of
> theft and where the questioning was persistent, emphatic, and
> expressly accusatory as to that one incident. We are confident
> that the brief and isolated questions and comments here did not
> affect the jury's verdict, and, therefore, that Thill suffered no
> prejudice from his counsel's failure to object.

*Id.* ¶¶ 24, 25.[5]

Thill appealed the court of appeals' decision, and the Wisconsin Supreme Court denied

his petition for review. He filed his habeas petition in this court on December 6, 2018.

ANALYSIS

In his habeas petition, Thill contends that his trial counsel provided constitutionally

ineffective assistance by failing to object to the prosecutor's comments impugning his silence

in front of the jury.

## A.  Legal standards

Claims for ineffective assistance of counsel are analyzed under the well-established

standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under the

*Strickland* standard, a petitioner must demonstrate both constitutionally deficient performance

by counsel and actual prejudice as a result of the alleged deficiency. *Williams v. Taylor*, 529

U.S. 362, 390–91 (2000). To demonstrate deficient performance, the petitioner must show

"that counsel's representation fell below an objective standard of reasonableness." *Strickland*,

466 U.S. at 687–88. To demonstrate actual prejudice, the petitioner must show that there was

---

[5] The trial lasted four days, not three, as stated by the court of appeals.

16

"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In the context of a petition for a writ of habeas corpus under § 2254, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) imposes a heightened standard of review on a claim for ineffective assistance of counsel. *Burt v. Titlow*, 571 U.S. 12, 15 (2013). A federal court may not grant a § 2254 petition unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Thus, a federal court evaluating an ineffective assistance claim in the context of a habeas petition must defer to both trial counsel's judgment and to the decision of the state court, making the federal court's review "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 189–90 (2011).

AEDPA deference applies only to the last state court to issue a "reasoned opinion" on the claim at issue. *See Thomas v. Clements*, 789 F.3d 760, 766–67 (7th Cir. 2015). This means that I will review the decision of the Wisconsin Court of Appeals rather than the circuit court's decision. And because the state court of appeals didn't decide whether the performance of Thill's trial counsel met *Strickland*'s deficiency prong, I will review that aspect of Thill's ineffective assistance claim de novo. *Id.* I will apply AEDPA deference when considering the prejudice prong.

## B.  Deficient performance

The Fifth Amendment provides that defendants have the right to remain silent after arrest, and it prohibits prosecutors from using a defendant's silence against him at trial. *See Griffin v. California*, 380 U.S. 609, 614 (1965). In *Doyle v. Ohio*, the Supreme Court applied this rule to reverse two state convictions in which a prosecutor had used the defendants' post-

arrest silence to impeach the exculpatory stories they told for the first time at trial. The defendants had been arrested as part of a marijuana sting operation. At trial, they testified that they had been framed by the confidential informant—a story that was "not entirely implausible" and that there was "little if any direct evidence to contradict." 426 U.S. at 613. As part of a wide-ranging cross-examination, the prosecutor questioned the defendants about why, if they were in fact innocent, they hadn't told the frameup story to the arresting officer when he arrived on the scene. The defendants' objections to this line of questioning were overruled.

On appeal to the Supreme Court, the state argued that the discrepancy between the defendants' silence at the time of arrest and their exculpatory story at trial gave rise to an inference that their story was fabricated somewhere along the way. Questioning the defendants about their silence was therefore permissible impeachment of their trial testimony, not impermissible suggestion of their ultimate guilt. The Supreme Court rejected this argument as incompatible with due process and the protections established in *Miranda v. Arizona*, 384 U.S. 436 (1966). It noted that:

> The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warning. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

426 U.S. at 617–18 (internal citations omitted).

Thill says that his trial counsel's failure to object to the prosecutor's questions and statements about Thill's silence qualifies as deficient performance. "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 688). Courts apply a "strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Id.* (citation and quotation marks omitted). To be considered deficient, the petitioner must "show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* (citation and quotation marks omitted). A "single error" may qualify as deficient performance, but only "if that error is sufficiently egregious." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). *See also Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) (an egregious error is "an omission of something obviously better (in light of what was known at the time) than the line of defense that counsel pursued").

A preliminary question is whether the prosecutor's commentary was in fact improper under *Doyle*. If it wasn't, Thill's counsel's failure to object to it couldn't have been an error, let alone an error serious enough to constitute deficient performance. The Court of Appeals for the Seventh Circuit has summarized the *Doyle* rule as follows: "[O]nce a defendant has been advised of his constitutional rights . . . particularly the 'right to remain silent,' the prosecution may not comment on his silence." *Kappos v. Hanks*, 54 F.3d 365, 368–69 (7th Cir. 1995). In assessing whether the government improperly commented on a defendant's silence, courts "determine whether: (1) it was the prosecutor's manifest intention to refer to the defendant's silence; or (2) the remark was of such a character that the jury would naturally and necessarily

take it to be a comment on the defendant's silence." *United States v. Ramos*, 932 F.2d 611, 616 (7th Cir. 1991) (citation and quotation marks omitted).

Here, there is little doubt that the prosecutor intended for the jury to draw an adverse inference from Thill's silence, and that the jury would have interpreted his comments accordingly. On cross-examination, the prosecutor called attention to Thill's failure to take advantage of "the opportunity to tell law enforcement [of the] facts that [he] hoped would exonerate [him]." Dkt. 6-12, at 556. And during his closing argument, the prosecutor said that "if what [Thill] told you is true, wouldn't we want to know that over a year ago and not put ourselves through this process?" and then explicitly instructed the jury that Thill's silence was "something that [it was] allowed to consider in deciding what weight to give the defendant's testimony." *Id.* at 683. It is clear that the prosecutor was asking the jury to draw an adverse inference against Thill because he hadn't offered his defense theory at the time of his arrest.

The state contends that the prosecutor wasn't commenting on Thill's post-arrest silence at all; instead, he was merely cross-examining Thill "for the limited purpose of revealing an inconsistency between what Thill told investigators and what he claimed at trial, not for implying that his silence is inconsistent with his claim of innocence." Dkt. 10, at 15. That is essentially the reasoning of the circuit court, which stated that Thill "started talking and gave the investigating officer information after he waived his Miranda rights" and that the prosecutor had "every right to question" Thill about his initial statements to law enforcement, Dkt. 6-15, at 54–55.

Prosecutors are permitted to probe inconsistencies between statements a defendant makes under questioning by law enforcement and statements he makes during trial. *See Anderson v. Charles* 447 U.S. 404, 408 (1980) ("*Doyle* does not apply to cross-examination that

merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all."). In this case, it is difficult to determine whether Thill's trial testimony was inconsistent with any statements that Thill made after his arrest because the parties haven't provided the transcript of Thill's questioning and neither side identifies any specific statements that Thill made.

But even if Thill's testimony *was* inconsistent with statements he made to the police, the state's argument fails because the state doesn't identify any inconsistent statements, and, more important, neither did the prosecutor. Rather, the prosecutor's focus was the perceived inconsistency between Thill's exculpatory story and his choice to remain silent. So the prosecutor violated *Doyle*.

The next question is whether Thill's counsel's failure to object to the prosecutor's statements qualifies as deficient performance under *Strickland*. The state contends that counsel's decision not to object was strategic, made to avoid drawing the jury's attention to "the point that the prosecutor [was] trying to make." Dkt. 10, at 13 (citing Thill's trial counsel's testimony from the postconviction hearing, at Dkt. 6-15, at 20).

Under *Strickland*, it is Thill's burden to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation marks omitted). In this case, trial counsel said that he didn't recall specifically why he didn't object, but he offered two reasons in hindsight : (1) the prosecutor's comments were in "a gray area" and "[n]ot over the line"; and (2) counsel didn't

want to "make a big deal out of a prosecutor pushing the envelope" because it would "just draw the jury's attention to the point that the prosecutor is trying to make."

The first reason is based on a misunderstanding of the law. As discussed above, the prosecutor's statements were a clear violation of *Doyle*. "[W]here the only reason counsel failed to object was his understanding that such testimony was not objectionable—and not some strategic judgment—counsel runs the risk of rendering performance that falls below the objective standard of reasonableness." *Carter v. Douma*, 796 F.3d 726, 736 37 (7th Cir. 2015).

The analysis is complicated in this case because of counsel's second reason, which is that an objection could have drawn more attention to the prosecutor's statements. Courts have recognized that "there may very well be strategic reasons for counsel not to object" to a prosecutor's objectionable comments, including a desire to "avoid calling attention to the statements and thus giving them more force." *Lambert v. McBride*, 365 F.3d 557, 564 (7th Cir. 2004) (defense counsel's failure to object to prosecutor's impassioned closing arguments that arguably "pushed the bounds of zealous advocacy" did not constitute deficient performance).

Trial counsel didn't say whether he would have objected despite his concerns if he had known that the prosecutor's statements were unlawful. But under the deferential *Strickland* standard, the question isn't simply what counsel would have or could have done; it is whether counsel's conduct "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. *See also United States v. Jones*, 861 F.3d 687, 691 (7th Cir. 2017) ("With a record that is silent on counsel's strategic motives, we give every indulgence to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight." (internal quotation marks and alterations omitted)).

Thill raises a strong argument that trial counsel should have objected to the prosecutor's *Doyle* violation. But there is also some force to the view that counsel's decision not to object "falls within a wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 690, in light of the possibility that objecting could have done more harm than good. The deficient performance question is a close, but I conclude that Thill has failed to satisfy *Strickland*'s prejudice prong, so I need not decide whether he has shown deficient performance.

## C. Prejudice

An error by counsel, even if professionally unreasonable, does not warrant granting habeas relief if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691. And because the Wisconsin Court of Appeals adjudicated the prejudice prong of Thill's *Strickland* claim, I apply AEDPA's standard of review to the prejudice inquiry, granting Thill's § 2254 petition only if the Wisconsin Court of Appeals' decision was contrary to or involved an unreasonable application of clearly established federal law.

"A decision is 'contrary to' clearly established federal law if the rule the decision applies differs from governing law set forth in Supreme Court cases. A decision involves an 'unreasonable application' of Supreme Court precedent if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002), and *Williams*, 529 U.S. at 407). Thill contends that the Wisconsin Court of Appeals' decision was both contrary to and an unreasonable application of the Supreme Court's decision in *Strickland*.

### 1. Contrary to *Strickland*

The court of appeals correctly identified *Strickland* as the governing legal standard, but Thill says that its decision was nonetheless contrary to *Strickland* because the court applied an

"outcome-determinative" test. That is, the court required Thill to show that but for trial counsel's unprofessional errors, the jury verdict would have been different. In *Strickland*, the Supreme Court explicitly rejected this test in favor of a requirement that petitioners show a "reasonable probability"—meaning a probability sufficient to undermine confidence in the outcome—that but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 693–94.

As Thill acknowledges, the Wisconsin Court of Appeals correctly paraphrased *Strickland*'s prejudice standard in its decision. *See* Dkt. 6-5, ¶ 24 ("Thill fails to show that there is a reasonable probability that, but for his trial counsel's failure to object to the prosecutor's brief and isolated questions about Thill's failure to tell the detective his full account of one of the incidents, the verdict would have been different."). He argues that the court nonetheless applied an outcome-determinative test, as demonstrated by its perfunctory analysis of the prejudice prong: "The court of appeals merely summarized the evidence and then provided two conclusory statements" expressing the court's confidence that Thill wasn't prejudiced by his counsel's performance. Dkt. 9, at 27.

Nothing about the court of appeals' reasoning suggests that it applied an outcome-determinative test. True, the court did state at the conclusion of its prejudice analysis that it was "confident that the brief and isolated questions and comments here did not affect the jury's verdict." Dkt. 6-5, ¶ 25. But that doesn't show that it had abandoned the reasonable probability standard it had articulated just one paragraph before. To the contrary, the court of appeals' phrasing suggests that it recognized confidence in the outcome as the touchstone of the analysis. Absent stronger evidence that the court of appeals applied an outcome-

24

determinative standard, I cannot say that its decision was contrary to *Strickland* for purposes of AEDPA.

### 2.  Unreasonable application of *Strickland*

The Wisconsin Court of Appeals concluded that Thill wasn't prejudiced by the prosecutor's questions and comments for four reasons: (1) the questions and comments were "isolated, made at the start of a lengthy and wide-ranging cross-examination of Thill and in the midst of a lengthy closing argument"; (2) the state offered much other evidence in support of a conviction, including AMM's forensic interview statements, her statements during her physical examination, her trial testimony, and testimony by her mother and grandmother; (3) despite the prosecutor's comments, Thill was able to present evidence challenging AMM's credibility, supporting his defense that AMM's mother was motivated to frame him after he ended their relationship, and showing his good character; and (4) the jury acquitted Thill of repeated acts of sexual contact, suggesting that the jury carefully considered the credibility of the witnesses.

If I were deciding this issue without deference to the state court of appeals, I might reach a different conclusion than the court of appeals. Thill's credibility was a key issue at trial, and the evidence against him was not overwhelming, so any efforts by the prosecutor to undermine Thill's credibility could have influenced the jury's decision.

But "[a] state-court decision can be a reasonable application of Supreme Court precedent even if . . . it is an incorrect application . . . [and] even if the petitioner presents a strong case for relief." *Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 443 (7th Cir. 2020) (internal quotation marks omitted)). Rather, "a state court's determination that a defendant was not prejudiced by his lawyer's ineffectiveness is entitled to great weight in a federal habeas corpus

proceeding." *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). In fact, a federal court may not grant a habeas petition unless "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Thill has not met that standard.

It is true that the court of appeals' decision was brief and some of its reasoning wasn't fully explained. But that's not enough to show an entitlement to relief. "[E]ven a state court 'opinion' consisting of the single word 'affirmed' is entitled to the full deference that the habeas corpus statute demands be given determinations by state courts." *Price*, 637 F.3d at 839.

There are also grounds for questioning the court of appeals' reasoning. But that's not enough either. The question isn't whether other courts could "disagree over [the state court's] reasoning," *McNary v. Lemke*, 708 F.3d 905, 920 (7th Cir. 2013), but whether any reasonable jurist could have reached the same conclusion. *Peterson v. Douma*, 751 F.3d 524, 532 (7th Cir. 2014).

The conclusion reached by the court of appeals is not beyond fairminded disagreement. The court of appeals was correct in observing that the prosecutor's statements were relatively brief, that the state presented substantial evidence in support of a conviction, and that Thill had a full opportunity to challenge the credibility of AMM and the state's other witnesses. One could reasonably contend that the court of appeals failed to fully appreciate the importance of the prosecutor's statements, but it is not the role of this court to weigh the evidence. It is also debatable what can be read from the jury's decision to acquit Thill of repeated sexual contact. Perhaps, as Thill contends, the mixed verdict suggests that the *Doyle* violations may have tipped the balance. But it could also mean that the jury was persuaded by

the physical evidence that the state offered to prove the March 8 offense, suggesting that prosecutor's statements made no difference to that conviction.

I must also consider what an objection would have accomplished. As discussed in the section on deficient performance, an objection wouldn't have stopped the prosecutor from asking the question, and a curative instruction could have led the jury to focus on the issue more. Even if I assume that a competent lawyer would have objected, the uncertain effect of an objection undermines Thill's contention that no fairminded jurist could have reached the same conclusion as the court of appeals.

Thill cites no other cases in which a court granted a habeas petition for a *Doyle* violation based on a similarly ambiguous record. In fact, Thill cites no cases in which a court granted a habeas petition based on a *Doyle* violation.

Thill would have a stronger argument if his silence after his arrest were the only significant weakness in his theory of defense. But his testimony at trial relied on multiple assertions that were either unexplained or implausible. Most notably, Thill failed to offer a persuasive explanation of how his semen was found on AMM's underwear. More generally, his theory that Gray was trying to frame him raised more questions than answers.

For example, Thill pointed to some evidence that Gray was upset after they broke up, but the March 8 incident was more than a year later. Thill pointed to no recent interactions that would suggest that Gray was still holding onto so much resentment that she would try frame him for sexually assaulting her child. He didn't allege that she had expressed jealousy over his new relationship or that she was trying to get back together with him. Rather, he suggested that she was angry over his decision to end their daughters' sleepovers. Thill didn't explain why he had allowed his daughters to remain friends with Gray's daughter if he believed

that Gray was so unstable, and he provided little explanation for his decision to end the sleepovers. But even if Thill's testimony about Gray's past conduct is true, it seems implausible that Gray would have such an extreme reaction to the decision.

This is not to say that the evidence was one-sided. Thill raised significant questions about both AMM's and Gray's credibility. But the jury heard all of that evidence and concluded that it wasn't persuasive on the March 8 sexual contact charge. Thill simply hasn't shown that no reasonable jurist could reject his view that there is a reasonable probability that the outcome of the trial would have been different if his trial counsel had objected to the prosecutor's inappropriate comments.

## D. Conclusion

My conclusion in this case should not be construed as an implicit endorsement of the prosecutor's conduct. *Doyle* is an established precedent, so any prosecutor should be aware of its holding. And the *Doyle* violation in this case seems clear. But the role of a federal court in deciding a habeas petition is highly circumscribed, particularly in the context of a claim for ineffective assistance of counsel. Even when a trial includes a clear error, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding"; instead, trial counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Morgan v. Hardy*, 662 F.3d 790, 802 (7th Cir. 2011). And it is not enough for a petitioner to show that the state court erred in concluding that the error wasn't prejudicial; he must show that "the state court's ruling . . . was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Under this demanding standard, Thill isn't entitled to habeas relief.

28

**E.  Certificate of appealability**

Under Rule 11 of the Rules Governing Section 2254 Cases, I must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted). I cannot say in this case that Thill has not made a substantial showing of a denial of a constitutional right. Other judges might disagree with the conclusion that petitioner isn't entitled to habeas relief. Accordingly, a certificate will issue.

ORDER

IT IS ORDERED that:

1.  Petitioner Ross R. Thill's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED.

2.  A certificate of appealability shall issue.

3.  The clerk of court is directed to enter judgment accordingly and close this case.

Entered September 10, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge